UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

INTERNATIONAL ASSOCIATION OF
SHEET METAL, AIR, RAIL &
TRANSPORTATION WORKERS,
LOCAL UNION NO. 71, et al.,

                    Plaintiffs,

     v.

LOVEJOY METALS, INC. and
DAVID F. ZAKROCZEMSKI, individually,

               Defendants.

**DECISION AND ORDER**

1:19-CV-00299 EAW

## <u>INTRODUCTION</u>

This action was commenced by plaintiffs International Association of Sheet Metal, Air, Rail & Transportation Workers, Local Union No. 71 (the "Union"); John Helak, Jeffrey Meyer, Michael Emiliani, Paul Crist, Richard Wagner, Andrew Nowak, David Nieman, and Robert Beck, as Trustees of the Sheet Metal Workers Local Union No. 71 Health and Welfare Trust Fund (the "Health and Welfare Fund"), the Sheet Metal Workers Local Union No. 71 Pension Fund (the "Pension Fund"), and the Sheet Metal Workers Local Union No. 71 Annuity Fund (the "Annuity Fund"); and John Helak, Brian Handzlik, Edward Bender, Jr., Paul Crist, Richard Delotto, Andrew Nowak, Tom Debalski, and David Nieman, as Trustees of the Sheet Metal Contractors and Local No. 71 J.A.C. Education and Training Fund (the "Training Fund") (collectively "Plaintiffs").[1] (Dkt. 1).

---

[1]    The Health and Welfare Fund, the Pension Fund, the Annuity Fund, and the Training Fund are hereinafter referred to collectively as the "Funds."

Plaintiffs seek relief from defendants Lovejoy Metals, Inc. ("Lovejoy") and David Zakroczemski ("Zakroczemski") (collectively "Defendants"), arising from alleged violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1002 *et seq.* ("ERISA"), Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), and New York State common law, based on Defendants' failure to remit required contributions to the Union.  (*See id.*).

Because Defendants have not appeared in this action, upon Plaintiffs' request (Dkt. 5), the Clerk of Court issued an entry of default as to Defendants on August 20, 2019 (Dkt. 6).  On August 23, 2019, Plaintiffs filed their first motion for default judgment.  (Dkt. 7). By Decision and Order dated December 18, 2019, the Court denied the motion without prejudice, finding that Plaintiffs' motion failed to articulate sufficiently the factual and legal bases for the relief sought.  (Dkt. 12).  Currently before the Court is Plaintiffs' second motion for default judgment.  (Dkt. 13).  For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

### I.   Factual Background

The following facts are taken from Plaintiffs' Complaint and motion papers and are accepted as true in light of Defendants' default.  *See Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contrs. Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) ("[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability . . . ").

The Union, a labor organization representing employees, maintains an office in Erie County, New York.  (Dkt. 1 at ¶ 7; Dkt. 13-1 at 2).  The Funds are jointly administered, multi-employer, labor-management trust funds established and maintained in accordance with various collective bargaining agreements pursuant to 29 U.S.C. §§ 186(c)(5) and 186(c)(6), employee benefit plans within the meaning of 29 U.S.C. § 1002(1), (2) (3), and multi-employer plans within the meaning of 29 U.S.C. §§ 1002(37) and 1145.  (Dkt. 1 at ¶¶ 9-13; Dkt. 13-1 at 2-3).[2]  Various collective bargaining agreements between the Union and signatory employers permit the Union to collect Working Assessments, P.A.L. Political Fund contributions, Vacation and Holiday Account contributions, and other fringe benefit contributions, which are deducted by employers from their employees' wages and remitted to the Union.  (Dkt. 1 at ¶¶ 8, 11; Dkt. 13-1 at 2).

Lovejoy is a domestic corporation doing business in Erie County, New York, and Zakroczemski is the President of Lovejoy.  (Dkt. 1 at ¶¶ 19, 21; Dkt. 13-1 at 3).  On behalf of Lovejoy, Zakroczemski signed a signatory sheet to a Collective Bargaining Agreement ("CBA") with the Union.  (Dkt. 1 at ¶ 22; Dkt. 1-4; Dkt. 13-1 at 3).[3]  By Zakroczemski's execution of the signatory sheet, Lovejoy became a signatory contractor with the Union,

---

[2]     The Health and Welfare Fund, the Pension Fund, and the Annuity Fund provide various fringe benefits to eligible union employees (Dkt. 1 at ¶ 11), and the Training Fund provides apprentice training and journeyperson retraining to eligible union employees (*id.* at ¶ 14).

[3]     The CBA was effective from May 22, 2013, through May 21, 2017.  (Dkt. 1 at ¶ 23; Dkt. 1-5).  The current CBA is in effect from May 22, 2017, through May 21, 2022.  (Dkt. 1 at ¶ 26; Dkt. 1-6).  Since it entered into the CBA, Lovejoy has never withdrawn from or repudiated the CBA, nor given written notice to the Union indicating an intention to withdraw from it.  (Dkt. 1 at ¶ 36).

agreeing to: comply with, abide by, and be bound by all provisions of the CBA between it and the Union, including any modifications, extensions, or renewals of the CBA (Dkt. 1 at ¶¶ 23, 24; Dkt. 1-5 at 26; Dkt. 1-6 at 25; Dkt. 13-1 at 3); become a party to and be bound by all the terms and provisions of the Agreements and Declarations of Trust for the Funds (the "Trust Agreements"); and make its required payments to the Funds (Dkt. 1 at ¶¶ 28-37; Dkt. 1-5 at 11-19; Dkt. 1-6 at 12-18; Dkt. 13-1 at 3).

The Trust Agreements authorize the Trustees to demand employer contributions and to take any necessary steps to collect such payments, including the commencement of legal proceedings.  (Dkt. 1 at ¶ 31; Dkt. 13-1 at 3).  The Funds set forth the terms and conditions that govern the employers' obligations to make contributions to the Funds. (Dkt. 1 at ¶ 37; Dkt. 13-1 at 3-4).

The Trustees executed a Collections Policy in 2014, which requires employers to remit payments due to the Funds by the 15th day of the month immediately following the month during which the hours requiring contributions were worked.  (Dkt. 1 at ¶¶ 38, 40; Dkt. 1-11 at 3; Dkt. 13-1 at 3-4).  In 2017, the Trustees revised the Collections Policy, and required employers to remit payments due to the Funds by the 10th day of the month immediately following the month during which the hours requiring contributions were worked.  (Dkt. 1 at ¶¶ 39, 42; Dkt. 1-12 at 3; Dkt. 13-1 at 4).  The 2017 Collections Policy directs that employers who fail to timely remit the requisite contributions to the Funds are assessed interest equal to one percent (1%) per month, compounded daily, to run from the due date on the amount of the delinquency until the delinquency is paid in full, in addition to ten percent (10%) of the entire delinquent amount in liquidated damages, and all fees

- 4 -

and costs incurred by the Funds in collecting delinquent contributions.  (Dkt. 1 at ¶ 43; Dkt. 1-12 at 3-4; Dkt. 13-1 at 4).

On April 18, 2016, Plaintiffs provided Zakroczemski with notice of Lovejoy being in default for failure to make payment of its required contributions.  (Dkt. 1 at ¶ 46; Dkt. 1-14; Dkt. 13-1 at 4).  In February 2017, an audit was performed of Lovejoy's payroll records by Arcara Zucarello Lenda & Associates PC ("February 2017 Audit") for the periods of January 30, 2012, through April 22, 2012, and January 1, 2015, through September 30, 2016.  (Dkt. 1 at ¶ 47; Dkt. 1-15; Dkt. 13-1 at 4).  The February 2017 Audit found no delinquencies for the period of January 30, 2012 through April 22, 2012, but that for the period of January 1, 2015, through September 30, 2016 ("2015-2016 Period") Lovejoy owed a total of $54,092.77.  (Dkt. 1 at ¶¶ 48-50 ($43,108.18 in unremitted employee fringe benefit contributions,[4] $6,673.76 in interest calculated through April 30, 2017, and $4,310.83 in penalties); Dkt. 1-15 at 2; Dkt. 13-1 at 4-5; Dkt. 13-8 at ¶ 11).  The February 2017 Audit also concluded that Lovejoy paid a total of $12,388.19 for over-reported hours worked for that same period.  (Dkt. 1 at ¶ 51; Dkt. 1-15 at 2; Dkt. 13-1 at 5; Dkt. 13-8 at ¶ 11).  On March 20, 2017, Lovejoy was provided with a copy of the February 2017 Audit by e-mail, which included a summary of the audit and notice to Lovejoy that it owed $41,704.58 (calculated by $54,092.77 (unremitted contributions plus interest and

---

[4]     As explained in greater detail below, the definition of what constitutes an "employee fringe benefit contribution" is not necessarily consistently defined in the submissions before the Court.

liquidated damages) less $12,388.19 (in overpaid contributions)).  (*Id.* at ¶ 52; Dkt. 1-16 at 2; Dkt. 13-1 at 5).

On May 25, 2017,[5] Plaintiffs sent Zakroczemski a letter outlining Lovejoy's outstanding obligations and a proposed Forbearance Agreement and Affidavit of Confession.  (Dkt. 1 at ¶ 53; Dkt. 1-17; Dkt. 13-1 at 5).  On or about July 3, 2017, Tom Helak (Business Manager of the Union), the Trustees (on behalf of the Funds), and Zakroczemski (on behalf of Lovejoy) entered into the Forbearance Agreement.  (Dkt. 1 at ¶ 54; Dkt. 1-18; Dkt. 13-1 at 5).  Pursuant to the Forbearance Agreement, Lovejoy conceded that it is bound by the CBA and federal statute to pay the required contributions in addition to interest, penalties, liquidated damages, and attorneys' fees if it did not timely pay the required contributions to the Funds and union dues as required.  (Dkt. 1 at ¶¶ 56, 57; Dkt. 1-18 at ¶ 1; Dkt. 13-1 at 5).  Lovejoy also admitted its indebtedness to the Union and the Funds for a total of $46,056.45 in required contributions and union dues, in addition to interest, fees, and audit costs.  (Dkt. 1 at ¶ 57; Dkt. 1-18 at ¶ 1; Dkt. 13-1 at 5).  As part of the Forbearance Agreement, Plaintiffs agreed to accept a "Settlement Amount" of $51,927.48, which included interest, but an agreement to forbear penalties, damages, and fees on the condition that Defendants complied with its obligations.  (Dkt. 1 at ¶¶ 58-59; Dkt. 1-18 at ¶ 1).  Lovejoy agreed to a payment schedule requiring eleven monthly payments of $4,327.00, and a final payment of $4,330.48.  (Dkt. 1 at ¶ 60; Dkt. 1-18 at

---

[5]     The letter is actually dated May 25, 2016, but the received stamp on it indicates it was received May 30, 2017, and the Forbearance Agreement is dated May 25, 2017, which together corroborate the inference that the 2016 date was a typographical error.

¶ 3).  Lovejoy failed to make the agreed payments, which constituted a default of the Forbearance Agreement, and Lovejoy currently remains in default of the Forbearance Agreement.  (Dkt. 1 at ¶¶ 61-63).

As additional deficiencies, between February 1, 2018, and March 31, 2018 ("2018 Period"), Lovejoy failed to submit payments it owed pursuant to ERISA, the CBA, Trust Agreements, and the 2017 Collection Policy.  (*Id.* at ¶ 66; Dkt. 13-1 at 5).  On March 27, 2018, Plaintiffs provided Zakroczemski with notice via email that Lovejoy was delinquent in its obligations to pay remittance funds and forbearance payments.  (Dkt. 1 at ¶ 67; Dkt. 1-20; Dkt. 13-1 at 5-6).

## II.   <u>**Procedural Background**</u>

Plaintiffs commenced this action against Defendants on March 7, 2019.  (Dkt. 1). The Complaint contains six causes of action. The first, third, and fourth causes of action are premised upon allegations of breach of contract and violations of the LMRA, based on the CBA in effect between Lovejoy and the Union.  (*See* Dkt. 1 at ¶¶ 85-86, 103-104, 111-112).  The second cause of action is premised on both breach of contract and violations of ERISA.  (*Id.* at ¶¶ 94-95).  Plaintiffs' fifth cause of action alleges that Zakroczemski is a fiduciary pursuant to ERISA and seeks equitable relief in the form of an accounting, injunctive relief, and reimbursement from Zakroczemski personally for any losses due to his breach of fiduciary duty.  (*Id.* at ¶¶ 118-119).  Finally, Plaintiffs' sixth cause of action appears to seek damages based on Lovejoy's breach of the Forbearance Agreement entered into by Lovejoy, the Union, and the Funds.  (*Id.* at ¶¶ 123-124).

Plaintiffs served Zakroczemski on March 23, 2019 (Dkt. 4), and Lovejoy on March 25, 2019 (Dkt. 3). Accordingly, Zakroczemski and Lovejoy were required to answer or otherwise respond to the Complaint on or before April 15, 2019. *See* Fed. R. Civ. P. 12(a)(1)(A)(i). Defendants failed to file responsive pleadings and, at Plaintiffs' request (Dkt. 5), the Clerk of Court issued an entry of default against Defendants on August 20, 2019 (Dkt. 6).

On August 23, 2019, Plaintiffs filed their first motion for default judgment. (Dkt. 7). Plaintiffs served their motion papers on Defendants at their last known addresses (Dkt. 9), and Defendants did not respond in opposition. By Decision and Order dated December 18, 2019, the Court denied the motion for default judgment. (Dkt. 12). On January 17, 2020, Plaintiffs filed the instant motion for default judgment. (Dkt. 13). Plaintiffs served their motion papers on their second motion for default judgment on Defendants at their last known addresses. (Dkt. 15). Defendants have not responded in opposition.

## DISCUSSION

I. **Legal Standard**

Federal Rule of Civil Procedure 55 sets forth the procedural steps for obtaining a default judgment. First, a plaintiff must seek entry of default where a party against whom it seeks affirmative relief has failed to plead or defend in the action. Fed. R. Civ. P. 55(a). Plaintiffs have obtained entry of default as to Defendants in this case. (Dkt. 6). "Having obtained a default, a plaintiff must next seek a judgment by default under Rule 55(b)." *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005); *see also* Fed. R. Civ. P. 55(b). "Once found to be in default, a defendant is deemed to have admitted all of the well-pleaded

allegations in the complaint pertaining to liability." *Philip Morris USA Inc. v. 5 Bros. Grocery Corp.*, No. 13-CV-2451 (DLI)(SMG), 2014 WL 3887515, at \*2 (E.D.N.Y. Aug. 5, 2014) (citation omitted).

"As the Second Circuit has noted, when determining whether to grant a default judgment, the Court is guided by the same factors which apply to a motion to set aside entry of default." *Krevat v. Burgers to Go, Inc.*, No. 13-CV-6258, 2014 WL 4638844, at \*5 (E.D.N.Y. Sept. 16, 2014) (citing *Pecarsky v. Galaxiworld.com, Ltd.*, 249 F.3d 167, 170-71 (2d Cir. 2001)). The three factors include: (1) "whether the defendant's default was willful"; (2) "whether the defendant has a meritorious defense to plaintiff's claims"; and (3) "the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *Id.* "[P]rior to entering default judgment, a district court is required to determine whether the [plaintiff's] allegations establish the [defendant's liability] as a matter of law." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011).

"Upon establishing a defendant's liability, the only remaining question is whether the plaintiff has provided adequate evidentiary support for the damages sought." *Granite Music Corp. v. Ctr. St. Smoke House, Inc.*, 786 F. Supp. 2d 716, 726 (W.D.N.Y. 2011) (citing *Greyhound Exhibitgroup, Inc. v. E.LU.L Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). "[A] defendant's default does not constitute admission of the plaintiff's allegations relating to the amount of damages." *Annuity, Pension, Welfare, Training & Labor Mgmt. Coop. Trust Funds v. Coastal Envtl. Grp., Inc.*, No. 18 Civ. 5773 (AMD) (ST), 2019 WL 4603805, at \*3 (E.D.N.Y. Sept. 5, 2019) (citing Fed. R. Civ. P. 8(b)(6); *Cement & Concrete*

*Workers Dist. Council Welfare Fund v. Metrofoundation Contractors, Inc.*, 699 F.3d 230, 234 (2d Cir. 2012)).  "Thus, upon establishing the liability of a defaulting defendant, the Court must conduct its own analysis to 'ascertain the amount of damages with reasonable certainty' by first 'determining the proper rule for calculating damages on [the given] claim' and then 'assessing plaintiff's evidence supporting the damages to be determined under this rule.'"  *Id.* (quoting *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).  "The plaintiff in such a case bears the burden to demonstrate 'that the compensation sought relate[s] to the damages that naturally flow from the injuries pleaded.'"  *Coastal Envtl. Grp., Inc.*, 2019 WL 4603805, at *3 (quoting *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 159).

Ultimately, "[t]he decision whether to enter default judgment is committed to the district court's discretion."  *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 116 (2d Cir. 2015); *Granite Music Corp.*, 786 F. Supp. 2d at 726 ("It is within the sound discretion of the District Court whether to enter a default judgment pursuant to Rule 55(b)(2), based on the assessment of the circumstances of the case and an evaluation of the parties' credibility and good faith.").

## II.   <u>Willfulness</u>

The Court finds that Defendants' default is willful.  Plaintiffs have submitted proof of service demonstrating the Summons and Complaint were served on Defendants on March 23, 2019 and March 25, 2019.  (Dkt. 3; Dkt. 4).  Moreover, Plaintiff's first motion for default judgment (Dkt. 7) was served upon Defendants at their last known addresses (Dkt. 9), and Defendants did not respond to it.  The instant motion (Dkt. 13) was also served

upon Defendants at their last known addresses (Dkt. 15), and again Defendants did not respond. "Defendant's failure to appear, failure to respond to the Complaint, and failure to respond to the instant motion sufficiently demonstrate willfulness." *Krevat*, 2014 WL 4638844, at *8 (citation omitted); *see also S.E.C. v. McNulty*, 137 F.3d 732, 738-39 (2d Cir. 1988) (defendant's failure to appear, to respond to complaint, and to respond to motion for default judgment indicates willful conduct); *Car Freshner Corp. v. Scented Promotions, LLC*, No. 519CV1158GTSATB, 2020 WL 5757475, at *4 (N.D.N.Y. Sept. 28, 2020) ("'An unexcused or unexplained failure to provide an answer to the Complaint will itself demonstrate willfulness,' as does failing to respond to both a complaint and a subsequent motion for default judgment." (quoting *United States v. Silverman*, 15-CV-0022, 2017 WL 745732, at *3 (E.D.N.Y. Feb. 3, 2017))); *Mason Tenders Dist. Council v. Duce Const. Corp.*, No. 02Civ.9044(LTS)(GWG), 2003 WL 1960584, at *2 (S.D.N.Y. April 25, 2003) ("Defendants, having failed to respond in any way to the Summons and Complaint or otherwise make any appearance in this action and having failed to provide for its failure to defend, have defaulted willfully.").

## III.   <u>Meritorious Defenses</u>

The Court next considers whether Defendants have a meritorious defense to Plaintiffs' claims. "A defense is meritorious if it is good at law so as to give the factfinder some determination to make." *Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996) (citation omitted). "While a defendant need not establish his defense conclusively, he must 'present evidence of facts that, if proven at trial, would constitute a complete defense.'" *Krevat*, 2014 WL 4638844, at *6 (quotation and citation omitted).

"[W]here a defendant fails to answer the complaint, a court is unable to make a determination whether the defendant has a meritorious defense to the plaintiff's claims, which circumstance weighs in favor of granting a default judgment." *Id.*

> The fact that a complaint stands unanswered does not, however, suffice to establish liability on [the] claims: a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading. With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action.

*Said v. SBS Electronics, Inc.*, No. CV 08-3067(RJD)(JO), 2010 WL 1265186, at *2 (E.D.N.Y. Feb. 24, 2010); *see also Krevat*, 2014 WL 4638844, at *7 ("Even if a plaintiff's claims are deemed admitted, a plaintiff must demonstrate that the allegations set forth in the complaint state valid claims."). Consequently, this factor weighs in favor of allowing Plaintiffs' motion for default judgment but nevertheless, the Court must assess whether Plaintiffs' allegations, accepted as true, demonstrate Defendants' liability as to each of Plaintiffs' causes of action, as discussed in more detail below.

## IV.    <u>Prejudice</u>

The Court finds that Plaintiffs, as the non-defaulting parties, would be prejudiced in the absence of a default judgment. "In other words, [w]ithout the entry of a default judgment, Plaintiff would be unable to recover for the claims adequately set forth in the Complaint." *Flanagan v. N. Star Concrete Constr., Inc.*, No. 13-CV-2300 (JS)(AKT), 2014 WL 4954615, at *7 (E.D.N.Y. Oct. 2, 2014). Accordingly, the prejudice that would result to the non-defaulting party also favors granting Plaintiffs' motion.

Having found these factors to tip in favor of allowing Plaintiffs' motion for default judgment, the Court turns to the merits of Plaintiffs' claims.

## V.    Merits of Plaintiffs' Claims

### A.    First Claim (Unremitted Union Working Assessments), Third Claim (Unremitted P.A.L. Political Fund Contributions), and Fourth Claim (Unremitted Vacation and Holiday Account Contributions) by the Union Against Lovejoy

#### 1.    Liability

Plaintiffs' first, third, and fourth causes of action seek unremitted contributions for Working Assessments, P.A.L. Political Fund contributions, and Vacation and Holiday Account contributions, respectively, from Lovejoy for the 2015-2016 Period and 2018 Period in violation of the CBA and pursuant to § 301(a) of the LMRA, which provides:

> Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount of controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  Under this section, "an employer may be held liable for failing to remit dues or make contributions to a labor organization as required by a CBA."  *Bricklayers Ins. & Welfare Fund v. P.P.L. Constr. Servs. Corp.*, No. 12-CV-3940 (DLI) (ST), 2017 WL 9481016, at *10 (E.D.N.Y. Jan. 12, 2017).

Pursuant to the CBA, Lovejoy is obligated to deduct from the wages of each of its employees performing covered work for Working Assessments, P.A.L. Political Fund contributions, and Vacation and Holiday Account contributions at the rates set forth in the CBA and to remit those contributions to the Union.  (Dkt. 1-5 at 15-17).  Plaintiffs allege

that Lovejoy breached the CBA and the LMRA by failing to remit these contributions. (Dkt. 1 at ¶¶ 8, 86, 104, 112).   These failures constitute a breach of the CBA and Defendants' obligations under the LMRA and, thus, the Court finds that Plaintiffs have sufficiently stated a claim upon which relief may be granted on its first, third, and fourth causes of action.   *See Int'l Bhd. of Elec. Workers Local 106 v. Marker Elec. Contracting, Inc.*, No. 16-CV-932-FPG, 2018 WL 4327815, at *4 (W.D.N.Y. Sept. 10, 2018) ("Defendant Marker, Inc.'s failure to remit the requisite deductions to Plaintiff IBEW and contributions to the Plaintiff Funds under the CBAs . . .  renders it liable under § 301(a) of the LMRA.").

## 2.   Damages

Having concluded that Plaintiffs have established Lovejoy's liability as to their first, third, and fourth causes of action arising under the LMRA, the Court must next determine the damages, if any, to which Plaintiffs are entitled.   "[A] plaintiff bringing a claim under Section 301 of the LMRA may recover only those damages provided for in the collective bargaining agreements and trust agreements."   *Coastal Envtl. Grp., Inc.*, 2019 WL 4603805, at *10 (citations omitted).   As noted, Plaintiffs seek the following for the 2015-2016 and 2018 Periods for unremitted: (1) Working Assessments (Claim 1); (2) P.A.L. Political Fund contributions (Claim 3); and (3) Vacation and Holiday Account contributions (Claim 4).   (*See* Dkt. 13-2 at 3-5).   Plaintiffs support their request for damages with the affidavits, and the exhibits attached thereto, of Cate Aronson, the Payroll Audit Manager at Arcara Zucarelli Lenda & Associates CPAs, PC (Dkt. 13-8 ("Aronson Affidavit")) and Ahren Vogl, the Benefits Administrator for the Union (Dkt. 13-6 ("Vogl

Affidavit")).  "If adequately explained and credited by the Court, the opinion of an auditor is a sufficient basis for an award of a specific amount of damages."  *Trs. of the Plumbers Local Union No. 1 v. Philip Gen. Constr.*, No. 05 CV 1665(NG)(RLM), 2007 WL 3124612, at *10 (E.D.N.Y. Oct. 23, 2007).

According to the Aronson Affidavit, the February 2017 Audit was updated in May 2019 to reflect payments received, interest through June 30, 2019, and a per diem interest rate.  (Dkt. 13-8 at ¶ 12).  Those calculations reflect that Defendants owe a total of $5,016.08 on these three claims—$4,705.89 in Working Assessments, $61.94 in P.A.L. Political Fund contributions, and $248.25 in Vacation and Holiday Account contributions—for the 2015-2016 Period.  (Dkt. 13-8 at ¶ 13; Dkt. 13-10 at 3).  The Aronson Affidavit and the exhibits attached thereto provide a sufficient accounting of the totals of delinquent contributions assessed.  (*See* Dkt. 13-9 at 7-21).  Accordingly, Plaintiffs have demonstrated their entitlement to these damages for the 2015-2016 Period.

According to the Vogl Affidavit, Defendants owe a total of $194.51 on these same three claims for the 2018 period—$112.36 in unremitted Working Assessments, $2.65 in unremitted P.A.L. Political Fund contributions, and $79.50 in unremitted Vacation and Holiday Account contributions.  (Dkt. 13-6 at ¶ 16).  The Vogl Affidavit and the exhibit attached thereto provide a sufficient accounting of the totals of delinquent contributions assessed.  (*See* Dkt. 13-6; Dkt. 13-7).  Accordingly, Plaintiffs have demonstrated their entitlement to these damages for the 2018 Period.

In sum, Plaintiffs have demonstrated their entitlement to a total of $4,818.25 for Working Assessments on their first cause of action, $64.59 in P.A.L Political Fund

contributions on their third cause of action, and $327.75 for Vacation and Holiday Account contributions on their fourth cause of action.  As a result, Plaintiffs' motion for default judgment is granted as to these three claims.

### B.    Second Cause of Action (Employee Fringe Benefit Contributions)

#### 1.    Liability

Section 515 of ERISA requires "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of . . . [a CBA] . . . [to] make such contributions in accordance with the terms and conditions of such [CBA]."  29 U.S.C. § 1145.  "A plan member's contractual duty to make contributions pursuant to Section 515 is enforceable in accordance with Section 502 of ERISA under which a plan fiduciary can bring a civil action to enforce the provisions of the plan or obtain equitable relief."  *Masino v. Aggregates Plus Ltd.*, No. 11-CV-00449 (FB)(RER), 2011 WL 3877687, at *2 (E.D.N.Y. Aug. 2, 2011) (citing 29 U.S.C. §§ 1132(a)(3)(B)(ii), 1132(d)(1)).

Here, Plaintiffs allege that Lovejoy is a party to the CBA, under which Lovejoy is obligated to make fringe benefit contributions for covered work performed during the 2015-2016 and 2018 Periods.  (*See* Dkt. 1 at ¶ 49; Dkt. 1-5; Dkt. 1-6).  Plaintiffs have sufficiently alleged that Defendants failed to remit requisite contributions for fringe benefit contributions to the Funds and that the trustees of the Funds have standing to pursue a civil claim for these contributions.  *See Marker Elec. Contracting*, 2018 WL 4327815, at *3. Accordingly, Plaintiffs have established Lovejoy's liability for a violation of ERISA § 515.

2.    **Damages**

Having concluded that Plaintiffs have established Lovejoy's liability as to their second cause of action, the Court must next determine the damages, if any, to which Plaintiffs are entitled.  A plaintiff who has established liability under ERISA § 515 is entitled to an award that includes: unpaid contributions, the greater of interest on unpaid contributions or liquidated damages, reasonable attorneys' fees and costs, and such other legal and equitable relief as the court may deem appropriate.  29 U.S.C. § 1132(g)(2); *Trustees of Pavers & Rd. Builders Dist. Council Welfare, Pension, Annuity, & Apprenticeship, Skill Improvement & Safety Funds v. Shelbourne Constr. Corp*., No. 19-CV-2312 (ARR)(PK), 2020 WL 1668041, at *5 (E.D.N.Y. Mar. 5, 2020) ("Pursuant to Section 502(g)(2) of ERISA, where a 'judgment in favor of the plan is awarded' under ERISA Section 515, the Court shall award the plan unpaid contributions, the greater of interest on the unpaid contributions or liquidated damages provided under the plan not exceeding 20% of the unpaid contributions, reasonable attorneys' fees and costs, and other equitable relief the Court deems appropriate." (quoting 29 U.S.C. 1132(g)(2))), *report and recommendation adopted*, 2020 WL 1666461 (E.D.N.Y. Apr. 3, 2020).

Plaintiffs seek unremitted fringe benefit contributions for covered work performed by Lovejoy's employees during the 2015-2016 and 2018 Periods, the accrued interest for such contributions, liquidated damages, attorneys' fees, and audit fees.  (Dkt. 13-1 at 11-12; Dkt. 13-2 at 3-4).  The Court will address each category of damages separately.

i.      **Unpaid Contributions**

The Court concludes that Plaintiffs have not provided adequate explanation and authentication to support their entitlement to damages on this claim, largely based on a lack of clarity in their submissions demonstrating how they arrived at the calculations.

As an initial matter, as noted, Plaintiffs bring this action as trustees of four funds: the Health and Welfare Fund, the Pension Fund, the Annuity Fund, and the Training Fund. (Dkt. 1 at 1-2).   The Complaint defines "Employee Fringe Benefit Contributions" to include required contributions to four funds: "the Welfare Fund, the Pension Fund, the Annuity fund, and the Training Fund."   (Dkt. 1 at ¶¶ 68, 89).   And to their Complaint, Plaintiffs attach trust agreements for four funds identified on the face of the agreements as the Industry Welfare Trust Fund (Dkt. 1-7), the Pension Fund (Dkt. 1-8), the Annuity Fund (Dkt. 1-9), and J.A.C. Educational and Training Fund (Dkt. 1-10).   The presumption from the allegations in the Complaint is that the fund referred to as the Health and Welfare Fund and the Industry Welfare Trust Fund are one and the same.

But the February 2017 Audit breaks down unpaid employee fringe benefit contributions to include not only the Working Assignments, P.A.L. Political Fund contributions and Vacation and Holiday contributions, but also the following five funds that it identifies as: (1) the annuity fund, (2) the industry fund, (3) the healthcare plan, (4) the JAC fund, and (5) the local pension fund.   These terms are not defined in the document or cover letter.   It is not clear on the face of the February 2017 Audit whether it is the designation in the spreadsheet for "the industry fund" or "the healthcare plan" that is intended to reflect the contributions to Health and Welfare Fund (as noted, identified in the

trust agreement as the Industry Welfare Trust Fund).  Based on the similar and overlapping language used in these descriptors and the lack of any definition for these terms as used in the February 2017 Audit or otherwise provided in the submissions on the instant motion, an inference could be made either way.  For example, the language in the February 2017 Audit overview could arguably be read to suggest that the fund referred to as "the industry fund" reflects the Health and Welfare Fund.  (*See* Dkt. 1-15 at 4 ("We have applied the procedures enumerated below to the payroll and related records of Lovejoy Metals, Inc., for the periods January 30, 2012 through April 22, 2012 and January 1, 2015 through September 30, 2016 which were agreed upon by the Trustees of the Sheet Metal Workers Local Union No. 71 *Pension, Annuity, and Industry Welfare Trust Funds . . . .*" (emphasis added))).  Conversely though, the CBA, which in addition to the Health and Welfare Fund contribution also includes an obligation of the employer to contribute to the "Sheet Metal Industry Fund Buffalo and W. N. Y. Trust," arguably confirms that the "industry fund" in the February 2017 Audit is actually intended to reference this contribution to the Sheet Metal Industry Fund Buffalo and W. N. Y. Trust, and not the Health and Welfare Fund.  (Dkt. 1-5 at 18).

Plaintiffs' submissions filed in support of the instant motion do not completely rectify this ambiguity.  According to their memorandum, Plaintiffs seek to recover unremitted fringe benefit contributions in the amount of $33,398.71 for the 2015-2016 Period and $3,222.23 for the 2018 Period, less any payments or credits made to date.  (Dkt. 13-1 at 11-12).  The $33,398.71 is the figure reflected in Plaintiffs' Complaint (Dkt. 1 at ¶ 95).  The affidavit of Plaintiffs' counsel in support the instant motion identifies

$27,648.88 as the requested total of unremitted employee fringe benefit contributions for the 2015-2016 Period (Dkt. 13-2 at ¶ 12(a)(ii)), and $3,222.23 for the 2018 Period (Dkt. 13-2 at ¶ 12(b)(ii)).  The Aronson Affidavit and attached exhibit are cited by counsel as support for this calculation.  (Dkt. 13-2 at ¶ 12(a)).  But the Aronson Affidavit identifies as the outstanding balance for employee fringe benefit contributions for the 2015-2016 Period as $28,363.90.  (Dkt. 13-8 at ¶ 13).  Aronson notes that she defines employee fringe benefit contributions to include the five funds of Annuity, Industry, Healthcare, JAC and Pension, but does not clarify which fund would be omitted from a damage calculation on the instant claim.  (*Id.*).  While the difference between Plaintiffs' counsel's affidavit and the Aronson Affidavit can potentially be explained by removing the balance attributable in Aronson's calculations to the amount attributable to "the industry fund," $715.01 (*see* Dkt. 13-10 at 3),[6] as the previous discussion makes clear, it has not been made evident in Plaintiffs' submissions that this was how they arrived at the calculation in their counsel's affidavit or even confirmed that Aronson's definition of "the industry fund" is the equivalent of the Health and Welfare Fund.  Moreover, it is not explained in the Aronson Affidavit how additional payments made were distributed across the funds, particularly where this claim is not being pursed as to one of the funds identified.  These are not inconsistencies for the Court to resolve on inference or speculation, nor is the Court required to comb through the

---

[6]    The Court notes that the difference between the two figures is actually off by one cent as the Aronson figure of $28,363.90 less the $715.01 for industry fund contributions results in a total of $27,648.89 and not the $27,648.88 noted by Plaintiffs' counsel.  In light of the ambiguities present, the Court need not concern itself with this minor discrepancy.

evidence in the record to calculate these figures when it is Plaintiffs' burden to establish their entitlement to damages.

Ambiguities arguably exist for the 2018 Period as well.  According to the Vogl Affidavit and exhibits attached thereto, Lovejoy owes a total of $3,222.23 in unpaid employee fringe benefit contributions for the 2018 Period.  (Dkt. 13-6 at ¶ 16).  The Vogl Affidavit and supporting exhibit identifies the Funds entitled to payment to consist of Healthcare, Pension (Local Pension), Annuity, and Training (JAC) Funds.  (*See* Dkt. 13-6; Dkt. 13-7).  It is not specified that Healthcare refers to the Health and Welfare Fund, defined by Plaintiffs in the Complaint as the "Health Fund."  While this presents less ambiguity than the "industry fund," the lack of consistency between the definitions in the Complaint and the terms used in the evidentiary support for damages is not ideal, particularly as discussed above, where the terminology between the identifiers use overlapping terms.

In light of these discrepancies, Plaintiffs' claim for damages arising from unpaid contributions is denied without prejudice for their failure to demonstrate their entitlement to these damages.  Any renewed motion by Plaintiffs seeking these particular damages must include supplemental briefing and adequate evidentiary support.

### ii.      Accrued Interest and/or Liquidated Damages

Plaintiffs seek accrued interest for unremitted employee fringe benefit contributions during the 2015-2016 and 2018 Periods and liquidated damages for the amount owed for the 2015-2016 Period.  (Dkt. 13-2 at 3-4).  ERISA permits liquidated damages in the amount equal to the greater of—the interest on the unpaid contributions or the amount of

liquidated damages provided for under the plan not exceeding 20% of the unpaid contributions.  29 U.S.C. § 1132(g)(2)(C).

Plaintiffs seek accrued interest for unremitted employee fringe benefit contributions in the amounts of $6,187.27 for the 2015-2016 Period and $584.68 for the 2018 Period. (Dkt. 13-2 at ¶ 12).  Pursuant to the Collections Policy, interest is assessed equal to one percent (1%) per month, to be assessed from the due date, on the amount of the delinquency until the delinquency is paid in full.  (Dkt. 1-1 at 3; Dkt. 1-12 at 3).  They also request liquidated damages in the amount of $2,095.57, calculated as 10% of the outstanding contributions.  Because Plaintiffs have not shown their entitlement to the underlying unremitted employee fringe benefit contributions for both the 2015-2016 and 2018 Periods, a necessary calculation to determine either the interest or liquidated damages owed, the Court is unable to confirm the exact amount of either category of damages on the present record.[7]

Accordingly, Plaintiffs' claim for damages seeking interest or liquidated damages is denied without prejudice for their failure to demonstrate their entitlement to these damages.  Any renewed motion by Plaintiffs seeking these particular damages must include supplemental briefing and adequate evidentiary support.

---

[7]     The Court also notes that the interest figure of $6,187.27 and liquidated damages figure of $2,095.57 in the Aronson Affidavit, and relied on by Plaintiffs, are derived from figures produced by the updated February 2017 Audit which as noted, appear to be calculated off of a balance consisting of five funds, not the four being pursued on this cause of action.  Should Plaintiffs renew their motion, this issue should be addressed.

### iii.      **Attorneys' and Paralegals' Fees and Court Costs**

Plaintiffs seek attorneys' fees and costs totaling $7,306.40.  (Dkt. 13-2 at ¶ 14).

ERISA § 502(g)(2)(D) mandates an award of "reasonable attorney's fees and costs of the

action" upon a determination that an employee benefit plan is entitled to judgment for

unpaid contributions.   29 U.S.C. § 1132(g)(2)(D); *see also LaBarbera v. Clestra

Hauserman, Inc.*, 369 F.3d 224, 226 (2d Cir. 2004) (in "an enforcement action under

§ 1145 for unpaid contributions and accrued interest, in which the ERISA plan receives a

judgment in its favor," "the statute renders fees and costs mandatory: 'the court shall award

the plan's reasonable fees and costs'" (citing § 1132(g)(2)); *Shelbourne Constr. Corp.*,

2020 WL 1668041, at *7 ("Attorneys' fees and costs are mandatory under ERISA.").

An award of attorneys' fees is required to be "reasonable."  *Shelbourne Constr.

Corp.,* 2020 WL 1668041, at *7.  "Courts calculate the presumptively reasonable fee—

commonly referred to as the lodestar—'by multiplying the number of hours reasonably

expended on the litigation' by 'a reasonable hourly rate.'" *Mason Tenders Dist. Council

Welfare Fund v. Gibraltar Contracting, Inc.*, No. 18CV3668MKVJLC, 2020 WL 5904357,

at *2 (S.D.N.Y. Oct. 6, 2020) (quoting *Soto v. Los Corbaticas Deli Grocery II Corp.*, No.

18-CV-3602 (JGK) (JLC), 2018 WL 4844018, at *7 (S.D.N.Y. Oct. 5, 2018)).  The Second

Circuit and the Supreme Court have both "held that the lodestar method—the product of a

reasonable hourly rate and the reasonable number of hours required by the case—creates a

'presumptively reasonable fee.'"  *Millea v. Metro-North R.R.*, 658 F.3d 154, 165 (2d Cir.

2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n. v. Cnty. of Albany*,

522 F.3d 182, 183 (2d Cir. 2008); *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1673

(2010)).  "[W]hether the calculation is referred to as the lodestar or the presumptively reasonable fee, courts will take into account case-specific factors to help determine the reasonableness of the hourly rates and the number of hours expended."  *Pinzon v. Paul Lent Mech. Sys., Inc.*, No. CV 11-3384 (DRH)(WDW), 2012 WL 4174725, at *6 (E.D.N.Y. Aug. 21, 2012), *report and recommendation adopted*, 2012 WL 4174410 (E.D.N.Y. Sept. 19, 2012).

The reasonableness of hourly rates is determined by the market rate "[p]revailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation," *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984), and the relevant community is generally the "district in which the court sits," *Polk v. N.Y. State Dep't of Corr. Servs.*, 722 F.2d 23, 25 (2d Cir. 1983).  "The party seeking reimbursement of attorneys' fees must demonstrate the reasonableness and necessity of hours spent and rates charged."  *Finkel v. Omega Cmmc'n Servs., Inc.*, 543 F. Supp. 2d 156, 164 (E.D.N.Y. 2008) (citing *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136 (2d Cir. 1983)).

"To determine whether the number of hours spent by counsel was reasonable, the Court must use its experience with the case, as well as its experience with the practice of law, to assess the reasonableness of the hours spent . . . in a given case."  *Div. 1811 Transit Union – N.Y. Emples. Pension Fund v. D & A Bus Co.*, 270 F. Supp. 3d 593, 619 (E.D.N.Y. 2017) (internal quotation marks, alterations, and citation omitted).  A court should "exclude hours that were 'excessive, redundant, or otherwise unnecessary' to the litigation. . . ."  *Cho v. Koam Med. Servs. P.C.*, 524 F. Supp. 2d 202, 209 (E.D.N.Y. 2007) (quoting *Henlsey v.*

- 24 -

*Eckerhart*, 461 U.S. 424, 434 (1983)).  In addition, "[a] fee application must be supported by time records that are sufficiently detailed to permit a court to determine the reasonableness of the hours claimed." *Caban v. Emple. Sec. Fund of the Elec. Prods. Indus. Pension Plan*, No. 10-CV-389 (SMG), 2015 WL 7454601, at *6 (E.D.N.Y. Nov. 23 2015) (citation omitted).  A court "is not obligated to undertake a line-by-line review of [an] extensive fee application," *Marion S. Mishkin Law Office v. Lopalo*, 767 F.3d 144, 150 (2d Cir. 2014), but instead, is free to "impose an across-the-board reduction if an attorney has billed excessive, redundant or unnecessary hours" or for vague billing entries.  *Kreisler v. Second Ave. Diner Corp.*, No. 10 Civ. 7592, 2013 WL 3965247, at *3 (S.D.N.Y. July 31, 2013); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 188 F. Supp. 3d 333, 344 (S.D.N.Y. 2016) ("It is common practice in this Circuit to reduce a fee award by an across-the-board percentage where a precise hour-for-hour reduction would be unwieldy or potentially inaccurate" (quotation and citation omitted)).

Here, Plaintiffs state that they incurred attorneys' fees in the amount of $6,679.75 ($6,107.25 (billed) plus $572.50 (pending billing)).  (Dkt. 13-2 at ¶¶ 14, 30, 31).  In support of these fees, Plaintiffs included a spreadsheet listing the billing attorney or paralegal, the hours expended, and the billed amount.  (*See* Dkt. 13-4).  The fees are comprised of hours billed by the following individuals at their respective rates: Robert L. Boreanaz, Esq. ($255.00 (2018); $265.00 (2019)); Mark L. Stulmaker, Esq. ($265.00 (2018); $275.00 (2019)); Joseph Guza, Esq. ($225.00 (2018); $235 (2019)); and Angela F. Borkowski, Paralegal ($90.00 (2018); $95.00 (2019)). (Dkt. 13-2 at ¶ 28).  According to Plaintiffs' affidavit in support of their motion, Attorney Boreanaz is a senior partner with 29 years of

ERISA litigation experience, Attorney Stulmaker is a senior partner with 37 years of ERSIA litigation experience, Attorney Guza is a partner with six years of ERISA litigation experience, and Ms. Borkowski is a paralegal with five or six years[8] of experience assisting with ERISA litigation related matters.  (Dkt. 13-2 at ¶¶ 1, 19, 21-23).  The Court finds the hourly rates in line with attorneys' fees awarded by courts in this district.  *Geist v. Hartford Life and Acc. Ins. Co.*, No. 07-CV-0065A(Sr), 2010 WL 5392647, at \*3 (W.D.N.Y. Nov. 29, 2010) (ERISA case approving $250 hourly rate for counsel with 24 years of experience, $180 hourly rate for counsel for six years of experience, and $65 hourly rate for paralegals); *Trs. Of the Buffalo Laborers' Pension Fund v. Accent Stripe, Inc.*, No. 01-CV-76C(SC), 2007 WL 2743441, at \*3 (W.D.N.Y. Sept. 18, 2007) ("[A] fee of $250.00 per hour for partners, $180.00 per hour for associates, and $100.00 per hour for paralegal time is consistent with the local market."); *Klimbach v. Spherion Corp.*, 467 F. Supp. 2d 323, 331 (W.D.N.Y. 2006) (ERISA case approving $250.00 hourly rate for partners, $180.00 hourly rate for associates, and $100 hourly rates for paralegals).

Having concluded that the hourly rates at issue are reasonable, the Court turns to whether the overall number of hours being claimed is also reasonable.  Here, Plaintiffs seek compensation for a total of 77.7 hours (73 hours billed for incurred attorneys' fees (*see* Dkt. 13-4 at 4) and 4.7 estimated billed hours for pending attorneys' fees (*see id.* at 5)).  Having conducted a review of the time records, the Court finds that the time expended on the matters identified was reasonable.  The billing records sufficiently document the hours

---

[8]     In their affidavit, Plaintiffs state that Ms. Borkowski has "five (6) [sic] years of experience."  (Dkt. 13-2 at ¶ 23).

claimed and adequately delineate the subject matter of the work performed.  There is no indication the work engaged in was duplicative or excessive.

Accordingly, the Court concludes that an award of attorneys' fees in the amount of $6,679.75 is reasonable.

Plaintiffs also seek costs in the amount of $626.65.  (Dkt. 13-2 at 11).  Courts typically award "those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee-paying clients."  *Reichman v. Bonsignore, Brignati & Mazzota, P.C.*, 818 F.2d 278, 283 (2d Cir. 1987).  "The fee applicant bears the burden of adequately documenting and itemizing the costs required."  *Volpe v. Nassau Cnty.*, No. 12-CV-2416 (JFB)(AKT), 2016 WL 6238525, at *10 (E.D.N.Y. Oct. 24, 2016).  The Court has reviewed the itemization of costs, which include expenditures for copies, postage, filing fees, and process service (*see* Dkt. 13-4), and finds that these costs are recoverable.  *See, e.g.*, *DIRECTV, LLC v. Wright*, No. 1:15-cv-00474-FPG, 2020 WL 289156, at *3 (W.D.N.Y. Jan. 21, 2020) (expenditures for copying, filing, legal research, travel, and postage are recoverable); *James v. Nat'l R.R. Passenger Corp.*, No. 02 Civ. 3915(RJH)(AJP), 2005 WL 6182322, at *22 (S.D.N.Y. Mar. 28, 2005) (properly documented process server fees, costs for travel, document duplication, facsimiles, messenger services, and exhibit preparation are recoverable).

Accordingly, Plaintiffs have demonstrated their entitlement to a total of $7,306.40 in attorneys' fees ($6,679.75) and costs ($626.65).

iv.    **Audit Fees**

Plaintiffs seek audit fees totaling $4,531.87.  (Dkt. 13-2 at 5).  "Requests for audit fees are 'generally determined by utilizing the same standards the court applies in awarding attorneys' fees.'"  *Teamsters Local 814 Welfare Fund v. Dahill Moving & Storage Co.*, 545 F. Supp. 2d 260, 269 (E.D.N.Y. 2008) (citation omitted).  "[A] party requesting audit fees must provide sufficient information to allow a court to determine the reasonableness of the fees requested."  *Bd. of Trs. of the Laborers Pension Fund v. Casale Constr. Servs.*, No. 1:18-CV-00583 (MAD/DJS), 2018 WL 4935731, at *3 (N.D.N.Y. Oct. 11, 2018) (denying audit fees where plaintiffs provided no specifics about the type of work that was performed, preventing the court from determining whether the requested audit fees were reasonable).

In support of their request for audit fees, Plaintiffs rely on the Aronson Affidavit which simply indicates that $4,531.87 is due in audit fees.  (*See* Dkt. 13-8 at ¶ 14; 13-10 at 2).  The affidavit does not otherwise specify the number of hours expended by the auditor, the hourly rate(s), or what work was performed.  (*See id.*).  Based on the lack of information provided, Plaintiffs' request for audit fees is denied.  *See Upstate N.Y. Eng'rs Health Fund v. Oneidaview Pile Driving, Inc.*, No. 5:15-CV-0512 (LEK/TWD), 2017 WL 1483446, at *4 (N.D.N.Y. Apr. 25, 2017) (denying audit fees where plaintiffs provided invoice stating number of hours worked and rate per hour without specifying what work was performed); *Eng'rs Joint Welfare Fund v. C. Destro Dev. Co.*, 178 F. Supp. 3d 27, 36 (N.D.N.Y. 2016) (same).

Accordingly, Plaintiffs' claim for damages seeking recovery of audit fees is denied without prejudice for their failure to demonstrate their entitlement to these damages. Any renewed motion by Plaintiffs seeking these particular damages must include supplemental briefing and adequate evidentiary support.

In conclusion, as to Plaintiff's second cause of action, Plaintiffs have established Defendants' liability. With respect to damages on this claim, Plaintiffs have demonstrated their entitlement to an award of attorneys' fees and costs, but in all other respects, their entitlement to damages on this claim is denied without prejudice. As a result, Plaintiffs' motion for default judgment is granted in part and denied in part as to Plaintiffs' second claim.

## C.    Fifth Cause of Action (Claim against Zakroczemski)

Plaintiffs seek default judgment to be entered against Zakroczemski, arguing that he was acting as a fiduciary to the money in question under 29 U.S.C. § 1002(21) and that by "retaining Fund assets that were not properly payable to Defendants and/or diverting Fund assets for Defendants['] own respective use or benefit" Zakroczemski violated 20 U.S.C. §§ 1104, 1103(a). (Dkt. 13-1 at 12-13). Plaintiffs seek "a judgment . . . requiring Defendant Zakroczemski to reimburse the Funds for any losses resulting from his breach of fiduciary duties and to restore to the Funds any profits which have been made through the use of Fund assets; and, granting any such other and further relief that this Court deems just and proper." (*Id.* at 13). Plaintiffs also seek to hold Zakroczemski and Lovejoy jointly and severally liable for $35,867.51 plus interest. (Dkt. 13-2 at 12).

- 29 -

The Court first addresses whether Zakroczemski may be personally liable for Lovejoy's unpaid contributions.  "In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).  ERISA identifies an individual "as a fiduciary with respect to a plan to the extent" the individual "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).  "Congress intended ERISA's definition of fiduciary 'to be broadly construed," and "[u]nlike the common law definition under which fiduciary status is determined by virtue of the position a person holds, ERISA's definition is functional."  *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997).  Accordingly, "'a person may be an ERISA fiduciary with respect to certain matters but not others'; fiduciary status exists only 'to the extent' that the person 'has or exercises the described authority of responsibility' over a plan."  *Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 366 (2d Cir. 2014) (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987)).

"[T]o establish an individual's fiduciary liability for unpaid ERISA contributions, courts within the Second Circuit require plaintiffs to show 'that (1) the unpaid contributions were plan assets and (2) [the alleged fiduciary] exercised a level of control over those assets sufficient to make him a fiduciary.'"  *Sheet Metal Workers Local Union No. 137 v. Metro.*

*Sign & Rigging Corp.*, No. 15-CV-6021 (LDH), 2016 WL 8652437, at *3 (E.D.N.Y. Sept. 13, 2016) (quoting *Sullivan v. Marble Unique Corp.*, No. 10 CV 3582 (NGG)(LB), 2011 WL 5401981, at *10 (E.D.N.Y. Aug. 30, 2011)).

Other than a wholly conclusory allegation, Plaintiffs have not shown that Zakroczemski exercised a level of control sufficient to deem him a fiduciary. *Trustees of United Plant & Prod. Workers Local 175 Benefits Fund v. Carlo Lizza & Sons Paving, Inc.*, No. 16CV5521DRHGRB, 2019 WL 5699992, at *1 (E.D.N.Y. Aug. 29, 2019) (denying motion for default judgment against individual defendant where complaint alleged in conclusory fashion that the individual was CEO and was signatory to parties' agreement and there were "no additional facts pleaded sufficient to establish defendant Elia Aly Lizza's status as a 'fiduciary' over ERISA funds such that she be held personally liable as an employer for unpaid contributions to the funds" (citing *In re Halpin*, 566 F.3d 286, 289 (2d Cir. 2009) ("Under ERISA, a person is a fiduciary with respect to a plan to the extent . . . [she] exercises any discretionary authority or control respecting management or disposition of its assets"))), *report and recommendation adopted*, No. 16CV5521DRHGRB, 2019 WL 4805044 (E.D.N.Y. Oct. 1, 2019).

Plaintiffs suggest that Zakroczemski "can also be held personally liable for the damages sought by the Plaintiffs because he executed the Signatory Sheet to the CBA." (Dkt. 13-1 at 13). "Although federal law governs disputes arising under ERISA and the LMRA, state law governs whether a collective bargaining agreement imposes liability on an individual signatory." *Sullivan*, 2011 WL 5401981, at *7 (citing *Mason Tenders Dist. Council Welfare Fund v. Thomsen Constr. Co.*, 301 F.3d 50, 53 (2d Cir. 2002); *Cement &*

*Concrete Workers Dist. Council v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994)).   "Under New York law, an agent who signed on behalf of a corporation will not be individually bound 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of [the corporation].'"   *Id.* (quoting *Lener v. Amalgamated Clothing & Textile Workers Union*, 938 F.3d 2, 5 (2d Cir. 1993)).   "This requirement 'guards against the risk that lengthy and formulaic contracts will lead unwary signatories to unintentionally assume personal liability,' especially since 'modern business often occurs between widely held, impersonal corporations, of which signatories only own a small stake.'"   *Id.* (quoting *Jacobsen v. Citi-Wide Elec. Corp.*, No. 03-CV-263, 2008 WL 4491374, at *2 (E.D.N.Y. Sept. 30, 2008)).

Because a finding of personal liability is "rare," "there must be 'overwhelming evidence of the signatory's intention to assume personal liability.'"   *Id.* at *8 (quoting *Thomsen Constr. Co.*, 301 F.3d at 53).   Courts consider the following factors to ascertain the intent of the signatory:

> (1) the length of the contract, (2) the location of liability provision(s) in relation to the signature line, (3) the presence of the signatory's name in the agreement itself, (4) the signatory's role in the corporation, and (5) the nature of the negotiations leading to the contract.

*Id.* (citing *Thomsen Constr. Co.*, 301 F.3d at 53).   Other relevant indicia "include the explicitness of the liability clause, the compositional elements of the signature page, and whether the signatory signed the agreement twice—once in his . . . personal capacity and once in his . . . professional capacity."   *Id.* (quoting *Philip Gen. Constr.*, 2007 WL 3124612, at *6).

Plaintiffs' argument that Zakroczemski's signature on the CBA agreement alone renders him personally liable fails. As discussed above, there must be "overwhelming evidence of [Zakroczemski's] intention to assume personal liability." *Sullivan*, 2011 WL 5401981, at *8. Plaintiffs have not provided any information that would demonstrate personal liability for Zakroczemski arising solely from his signature on Lovejoy's behalf and default judgment in their favor on this basis would not be appropriate. *Trustees of the Local 813 Pension Trust Fund v. Canal Carting, Inc.*, No. 12-CV-0060 (CBA) (RLM), 2014 WL 843244, at *7 (E.D.N.Y. Mar. 3, 2014) ("Absent proof that an individual owner or officer intended to assume ERISA liability as a personal obligation [such as by signing a CBA in an individual capacity], the owner will not be held liable for corporate ERISA obligations solely by virtue of his [or her] role as officer, shareholder or manager") (internal citations omitted); *Bianco v. Seaway Indus. Servs., Inc.*, No. 03-CV-0084E(F), 2004 WL 912916, at *3 (W.D.N.Y. Apr. 1, 2004) (denying motion for default judgment as to signatory of CBA where party failed to present "evidentiary proof . . . linking [signatory] to the cba" and or that he agreed to be bound to its terms).

As a result of a lack of any evidence supporting liability on this claim, Plaintiffs' motion for default judgment is denied as to the fifth claim.

### D. Sixth Cause of Action (State Law Breach of Forbearance Agreement against Defendants)

Plaintiffs' sixth cause of action seeks damages based on Lovejoy's breach of the Forbearance Agreement entered into by Lovejoy, the Union, and the Funds. (*See* Dkt. 1 at ¶ 120-25). In its Decision and Order dated December 18, 2019, the Court found that

Plaintiffs had failed to meet their burden showing their entitlement to relief as to the sixth cause of action.  (*See* Dkt. 12 at 4 ("To the extent that Plaintiffs may be relying on the Forbearance Agreement to establish liability, they have made no effort to articulate the application of that agreement to the damages sought.  Nor have Plaintiffs referenced the sixth cause of action, which claims a breach of the Forbearance Agreement, as part of their motion.")).

In the instant second motion for default judgment, Plaintiffs have again failed to articulate entitlement to relief under their sixth cause of action.  Plaintiffs simply refer to the sixth cause of action in the context that default judgment should be entered against Zakroczemski on this cause of action "based on his capacity as Defendant Lovejoy's president," (Dkt. 13-1 at 13), but without addressing the merits of the underlying claim.  Moreover, it is unclear what damages Plaintiffs seek in connection with this claim.  For example, in their Complaint, Plaintiffs request "all other relief permitted under New York State law and statute" as to their state law breach of Forbearance Agreement claim, (Dkt. 1 at 28), but have failed to articulate in their motion the applicable New York state law or statute and what relief they are entitled to, separate and apart from the damages in connection with their first four causes of action.[9]

As a result of a lack of any evidence supporting liability on this claim, Plaintiffs' motion for default judgment is denied as to the sixth claim.

---

[9]    Because Plaintiffs have failed to address the underlying liability under the breach of contract claim, the Court need not address Plaintiffs' argument as to whether judgment may be entered against Zakroczemski on this claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for default judgment (Dkt. 13) is granted in part and denied in part. Plaintiffs have established liability as to Defendants in connection with their first four causes of action. However, due to inadequate evidentiary support and deficiencies in their briefing, the Court grants their request for damages, only in part, as follows: $4,818.25 in connection with their first cause of action; $64.59 in connection with their third cause of action; $327.75 in connection with their fourth cause of action; and $6,679.75 in attorneys' fees and $626.65 in costs in connection with their second cause of action. Plaintiffs' motion is denied in all other remaining respects. Any renewed motion by Plaintiffs for damages on their second cause of action must contain supplemental briefing that cures the deficiencies as outlined in this Decision and Order. Plaintiffs shall serve a copy of this Decision and Order on Defendants at their last known addresses and shall file proof of service of the same.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated:      October 15, 2020
            Rochester, New York